**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**CORISSA D. B.,**

      **Plaintiff,**

                           **Civil Action 2:21-cv-1816**
  **v.**                       **Judge Sarah D. Morrison**
                           **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Corissa D. B., brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for social security disability insurance benefits[1] and supplemental security income ("SSI"). This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 13), the Commissioner's Memorandum in Opposition (ECF No. 18), Plaintiff's Reply (ECF No. 19), and the administrative record (ECF No. 10). For the reasons that follow, the Undersigned **RECOMMENDS** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's non-disability decision.

---

[1] Plaintiff amended her alleged onset date of disability to October 20, 2017 and thereby was no longer entitled to a period of disability and disability insurance benefits under Title II of the Social Security Act because her disability insured status expired. *See*, 20 CFR 404.130, 404.131, and 404.315. On February 6, 2019, Plaintiff withdrew her request for hearing as it pertains to the application for a period of disability and disability insurance benefits. (R. at 372.)

1

## I.    BACKGROUND

Plaintiff protectively filed her application for SSI on October 20, 2017, alleging that she had been disabled since January 1, 2015.  (R. at 352-60.)  Plaintiff's application was denied initially in February 2018, and upon reconsideration in June 2018.  (R. at 175-214, 215-62, 263-69, 274-85.)  On August 21, 2019, Plaintiff, represented by counsel, appeared and testified at a video hearing held by an Administrative Law Judge ("ALJ").  (R. at 155-74.)   A vocational expert ("VE") also appeared and testified.  (*Id.*)  On October 2, 2019, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 116-42.)  On February 9, 2021, the Appeals Council denied Plaintiff's request for a review of the ALJ's decision, which became the Commissioner's final decision.  (R. at 1-7.)  Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY

The ALJ summarized Plaintiff's statements to the agency and the relevant hearing testimony as follows:

> [Plaintiff] testified that she had two fusion surgeries on her back and returned to work after each procedure. She indicated she continued to have back pain and could not handle working. [Plaintiff] noted her son helps her with things, such as carrying cat litter. She stated that her physician has discussed giving her a spinal cord/bone stimulator. [Plaintiff] testified she is taking Tylenol for pain, as her doctor will no longer prescribe Tramadol. She indicated she lies down during the day and uses ice to treat her pain. [Plaintiff] noted she had a heart attack in March of 2018 and was prescribed cholesterol medication. She stated since her heart attack, she is unable to walk one block without needing to sit. [Plaintiff] testified she is not able to sit very long without changing position. She indicated she was prescribed a cane "a couple weeks ago."

(R. at 126.)

2

*** [Plaintiff] reported she washed dishes and dust where she could reach. [Plaintiff] noted that she did laundry weekly. She indicated that she could drive and go out alone. [Plaintiff] stated she shopped in stores and by computer. She reported she was capable of paying bills and using a checkbook (Exhibit 6E). Furthermore, [Plaintiff] *** that she was usually out of bed each morning by seven o'clock and started the day by texting her elderly father to make sure he was well. She stated that she then ate breakfast, took her medication, and showered. During the day, [Plaintiff] noted that she might attend to such chores as washing dishes and dusting. [Plaintiff] reported her hobbies were movies and television. She indicated she had five friends with whom she enjoyed talking and visiting. [Plaintiff] noted she prepared her supper around six o'clock and in the evening, she usually watched television until retiring for the night (Exhibit 43F).

(R. at 130.)

## III.  MEDICAL RECORDS

The ALJ summarized the relevant medical records concerning Plaintiff's physical impairments[2] as follows:

*** [Plaintiff] has history T7 and T8 corpectomies, T6- 7, T7-8, and T8-9 diskectomies, and T6-9 fusion on September 26, 2016. She also had T6-8 hemilaminectomies with T5-10 fusion on February 6, 2017. *** [D]uring an examination on October 31, 2017, Abdi Ghodsi, M.D., at PARS Marietta Office indicated [Plaintiff] had some limited range of motion of the thoracic and lumbar spine, but she denied any muscular weakness, incoordination, loss of balance, or falls. [Plaintiff] had 5/5 motor strength of the bilateral lower extremities. She was able to stand without difficulty and ambulate without assistance (Exhibit 40F). On February 20, 2018, Dr. Ghodsi noted [Plaintiff]'s thoracic x-rays taken today showed good alignment, unchanged hardware, and no evidence all five change in the position of the arthrodesis either anteriorly or posteriorly. Dr. Ghodsi stated that he did not believe any further surgical intervention could assist with [Plaintiff]'s pain symptoms, but he would try to get her a bone stimulator again. He noted [Plaintiff] was currently having physical therapy.

---

[2] Plaintiff's Statement of Errors raises arguments about only the ALJ's treatment of the evidence relating to her physical impairments. Accordingly, the Court will set forth only the facts relevant to Plaintiff's arguments.

3

Even considering obesity, [Plaintiff] is capable of light exertion with some postural and environmental restrictions. This is reflected in primary care notes dated December 1, 2017, by Amy Welch, CFNP, who indicated [Plaintiff] was 5'1.5" in height and weighed 195 pounds with body mass index (BMI) of 36.2. However, Ms. Welch further noted [Plaintiff] ambulated normally and denied any shortness of breath (Exhibit 41F). There is little evidence of complaints relating to osteoarthritis, and respiratory conditions, although the undersigned considered the conditions when finding [Plaintiff] capable of light exertion with the limitations as identified. During an emergency room visit on December 20, 2017, [Plaintiff] had complaint of cough and right hip pain. [Plaintiff] had history of extensive smoking, but her chest x-rays showed clear and well aerated lungs. She also had x-rays of the right hip revealing no acute osseous finding or degenerative changes (Exhibits 42F and 50F). On September 19, 2018, Mr. Biedenbach indicated [Plaintiff] had osteoarthritis (Exhibit 61F). However, the x-rays of [Plaintiff]'s right knee taken on November 5, 2018, were normal (Exhibit 67F, p.1). On that same day, Mr. Biedenbach noted during examination that [Plaintiff] had only slight edema of the right knee, which was not tender. He indicated [Plaintiff] would take Neurontin for osteoarthritis complaints (Exhibit 68F, p.5). However, even an ultrasound Venous Doppler of the right lower extremity showed no acute deep venous thrombosis or superficial venousthrombosis (Exhibit 67F, p.2).

Even the orthopedic records by Dr. Kumler dated February 28, 2018, reveals [Plaintiff] ambulated without assistance. Dr. Kumler noted [Plaintiff] did not have significant pain over the lumbar spine with palpation. He stated [Plaintiff] got up and down from the examination table independently. Dr. Kumler indicated [Plaintiff] had excellent strength in hip flexion extension and no pain with range of motion of the knees. He stated x-rays of the pelvis and right hip showed [Plaintiff] had very normal appearing joints. Dr. Kumler noted [Plaintiff] had no significant objective findings today. He indicated [Plaintiff] should add stretching and hip flexor stretching, as well as strengthening exercises of the muscles around her hip to her current physical therapy program. Dr. Kumler advised [Plaintiff] that she would benefit from significant weight loss and core exercises program (Exhibit 47F). [Plaintiff] was compliant with the treatment plan and started physical therapy on February 19, 2018. On March 2, 2018, the recommendations by Dr. Kumler regarding her hip were added to her therapy. [Plaintiff] reported at discharge on April 23, 2018, that she had 75 percent improvement (Exhibits 44F and 48F).

4

*** [T]he x-rays of [Plaintiff]'s lumbar spine taken on April 30, 2018, showed only slight disc space narrowing at L5-S1 with no evidence of compression fracture or subluxation (Exhibit 53F). The MRI of [Plaintiff]'s lumbar spine on May 23, 2018, showed central to left foraminal disc extrusion at L5-S1 with mild left foraminal stenosis and small right foraminal disc protrusion with mild right foraminal stenosis at L2-L3 (Exhibit 55F, p.8). Dr. Ghodsi reviewed [Plaintiff]'s MRI objective findings on May 25, 2018, and advised her that she had no significant disc herniation or central stenosis. He noted [Plaintiff] did not require any intervention as far as the lumbar spine was concerned (Exhibit 55F, p.10). On July 26, 2018, Mr. Biedenbach noted [Plaintiff]'s thoracic back pain was well controlled (Exhibit 61F). In fact, a CT scan of [Plaintiff]'s thoracic spine taken on August 10, 2018, showed stable postsurgical changes of the dorsal spine (Exhibit 59F). [Plaintiff] presented in follow-up to Dr. Ghodsi on August 21, 2018, and ambulated without assistance. She had 5/5 motor strength of the bilateral lower extremities. [Plaintiff] denied any chest pain, muscular weakness, tingling, or numbness (Exhibit 60F).

A CT scan of [Plaintiff]'s thoracic spine taken on December 26, 2018, showed stable appearance of the thoracic construct from T5 to T10 with no evidence of an acute osseous abnormality (Exhibit 65F, p.2). In follow-up, [Plaintiff] presented for neurosurgical evaluation to Dr. Vasilakis on January 15, 2019, and demonstrated normal gait, as well as normal muscle tone throughout. She had some pain with range of motion of the thoracic/lumbar spine and paraspinal tenderness. However, [Plaintiff] had full range of motion of all extremities. Dr. Vasilakis indicated he would obtain an MRI of the spine to rule out foraminal stenosis. He stated [Plaintiff] was probably a good candidate for spinal stimulation for pain control (Exhibit 66F).

The MRI of [Plaintiff]'s thoracic spine taken on February 7, 2019, showed impressions of posterior fusion at T5 through T10 which included corpectomy at T7-T8, as well as lateral fusion plate from T6 through T9, unchanged. The hardware was better seen on thoracic CT. The previously noted seroma/fluid collection around the posterior hardware had resolved. There was no cord signal aberration, acute fracture, infection, or neoplastic change (Exhibit 67F, p.14). [Plaintiff] testified that she had a cane prescribed two or three weeks ago, but the record does not reflect difficulties with ambulation or support the requirement of any assistive device. In fact, at a follow-up on February 12, 2019, Dr. Vasilakis again noted [Plaintiff] had normal gait and full range of motion of all extremities. Dr. Vasilakis stated that [Plaintiff]'s MRI showed no cord compression or severe foraminal stenosis. He indicated that he believed [Plaintiff] was a good candidate for spinal stimulation for pain control (Exhibit 66F). However, on May 21, 2019, Mr. Biedenbach noted [Plaintiff] had normal inspection of the thoracic/lumbar spine

5

with no spinal tenderness or paraspinal tenderness (Exhibit 68F). [Plaintiff]'s x-rays on June 5, 2019, showed impressions of mild curvature of the lumbar spine convex left, straightening of the normal lordotic curvature of the lumbar spine, mild multilevel degenerative disc disease, most prominent L5-51, mild facet degenerative changes of the lower lumbar spine, and postsurgical changes of previous thoracic spine surgery (Exhibit 67F, p.49). As recently as July 8, 2019, [Plaintiff] denied having pain during a visit with Mr. Biedenbach. However, Mr. Biedenbach noted [Plaintiff] had a recent urine drug test and acknowledged she had taken one half of her husband's Oxycodone. He advised [Plaintiff] that he was stopping all of her controlled substances due to prescription drug abuse (Exhibit 68F).

Concerning coronary artery disease, obesity, and hypertension, [Plaintiff] was admitted to the hospital on March 4, 2018, with complaint of intermittent left-sided chest pain accompanied by nausea and mild shortness of breath. She had left heart catheterization showing LAD 10% lesion, circumflex 10% lesion, and RCA 10% lesion, reflective of only mild coronary artery disease. [Plaintiff]'s ejection fraction was 60% and she was stable to discharge on March 5, 2018, with instructions to continue on the same medications, other than to add Aspirin and Atorvastatin, but stop Metformin, as it was no longer needed (Exhibit 53F). [Plaintiff]'s coronary artery disease is effectively controlled with medication. In fact, when [Plaintiff] presented to John Biedenbach, CNP, on March 9, 2018, he stated that her heart catheterization showed only 10 percent plaques with nothing that needed stenting. [Plaintiff] was continued [Plaintiff] on Atorvastatin for treatment of coronary artery disease (Exhibit 52F). On January 15, 2019, [Plaintiff]'s blood pressure was 126/78 and she weighed 201 pounds. She denied any cardiac or respiratory complaints (Exhibit 66F). Mr. Biedenbach indicated on January 30, 2019, that [Plaintiff]'s blood pressure was 120/70. [Plaintiff] acknowledged that she continued to smoke, but had no respiratory abnormalities on examination of the lungs (Exhibit 68F). [Plaintiff]'s chest x-rays performed on March 5, 2019, showed no acute pulmonary disease (Exhibit 67F, p.16).

[Plaintiff] did present to the hospital with complaint of chest pain on March 19, 2019, but her EKG did not show any signs of acute ischemia. She had laboratory screening, including Troponin, which did not show any abnormalities. [Plaintiff] had a cardiac cardiolite stress test on March 20, 2019, which showed no convincing scintigraphic evidence of infarct or ischemia and ejection fraction calculated at 55%. She was advised to stop smoking, but declined a Nicotine patch (Exhibit 68F).

On July 8, 2019, Mr. Biedenbach noted [Plaintiff]'s blood pressure was 120/68. Furthermore, [Plaintiff]'s diabetes is maintained with oral medication, even though she is not always compliant. On February 15, 2018, Ms. Welch noted [Plaintiff]'s laboratory screening revealed A1C of 5.7 and glucose of 88. She encouraged [Plaintiff] to do cardiovascular exercise 20 minutes every day (Exhibit 46F). During a visit on June 13, 2018, [Plaintiff] reported to Mr. Biedenbach that she was taking Metformin 500mg, but was not checking her sugars and never ordered a glucometer (Exhibit 58F). Mr. Biedenbach referred [Plaintiff] for laboratory screening, which showed A1C of 6.1 (Exhibit 57F, p.11). [Plaintiff]'s laboratory screening on January 30, 2019, revealed normal glucose level of 92 with A1C of 6.2 (Exhibit 67F, p.4). Also[,] on that date, [Plaintiff] reported her fasting blood sugars were under 130 and Mr. Biedenbach noted her diabetes was well controlled. On March 19, 2019, [Plaintiff]'s glucose level was 103 (Exhibit 68F).

(R. at 126-29.)

## IV. ADMINISTRATIVE DECISION

On October 2, 2019, the ALJ issued the non-disability determination. (R. at 116-42.) At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff has not engaged in substantially gainful activity since October 20, 2017, the amended alleged onset date. (R. at 121.)

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

7

The ALJ found that Plaintiff had the severe impairments status post two back surgeries to the thoracic spine, degenerative disc disease of the thoracic spine with stenosis/spondylolisthesis, degenerative disc disease of the lumbar spine, coronary artery disease, osteoarthritis, obesity, chronic obstructive pulmonary disease (COPD), emphysema, diabetes, and hypertension. (R. at 121-22.) She further found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 124.)

Before proceeding to step four, the ALJ set forth Plaintiff's residual functional capacity ("RFC"), in pertinent part, as follows:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she can never climb ladders, ropes, or scaffolds. [Plaintiff] can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. She must avoid frequent exposure to excessive cold, heat, humidity, fumes, odors, dusts, gases, poor ventilation, vibration, and workplace hazards, such as moving machinery or unprotected heights.

(R. at 125.)

At step four, the ALJ determined that Plaintiff is capable of performing her past relevant work as a waitress. (R. at 131.) At step five, considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that she can perform, such as a clerical assistant, sorter, or produce weigher. (R. at 132.) The ALJ therefore concluded that Plaintiff has not been disabled under the Social Security Act since her amended alleged onset date of October 20, 2017. (*Id.*)

## V.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives [Plaintiff] of a substantial right.'"

*Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.   ANALYSIS

Plaintiff raises two issues in her statement of errors.  First, Plaintiff asserts that the ALJ erred by discrediting the opinions provided by her treating nurse practitioner, John Biedenbach, CNP.  (ECF No. 13 at 8-12.)  Further, Plaintiff contends that, under *Seila Law LLC v. CFPB*, 591 U.S. -- 140 S.Ct. 2183 (June 20, 2020), the Social Security Administration's structure is unconstitutional as it violates the separation of powers doctrine. (*Id.* at 13-17.)  The Undersigned will consider Plaintiff's alleged errors in reverse order and, as explained below, concludes that Plaintiff's arguments are not well taken.

### A.  Separation of Powers

Plaintiff asserts that remand is required because a statute that provided tenure protection to the former Commissioner of Social Security Andrew Saul violated the separation of powers doctrine.  She contends, therefore, that the decision to deny her benefits was made by individuals who lacked a proper delegation of power to make a benefits determination. The Undersigned finds no merit to this Constitutional claim.

As a preliminary matter, Plaintiff's claim, in the manner she has raised it here, is procedurally improper.  *Butcher v. Comm'r of Soc. Sec.*, No. 2:20-cv-6081, 2021 WL 6033683, at *6 (S.D. Ohio Dec. 21, 2021); *Crawford v. Comm'r of Soc. Sec.*, No. 2:21-CV-726, 2021 WL 5917130, at *7 (S.D. Ohio Dec. 14, 2021). This is so because Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint must contain a "short and plain statement of the

10

claim showing that the pleader is entitled to relief." Although a complaint need not provide "detailed factual allegations," it "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell v. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). At a minimum, a complaint must "give the defendant fair notice of what the. . . claim is and the grounds upon which it rests." *Id*. Here, the United States Supreme Court case upon which Plaintiff bases his Constitutional claim was decided on June 20, 2020. Plaintiff, however, gave no notice, let alone fair notice, of this claim in her Complaint filed on April 14, 2021. (ECF No. 4.) *Butcher,* 2021 WL 6033683, at *6 (citing *John R. v Comm'r of Soc. Sec.*, Case No. C20-6176-MLP, 2021 WL 5356719, *7 (W.D. Wash. Nov. 16, 2021) (finding that a plaintiff failed to comply with Rule 8 by failing to plead a separation of powers claim in complaint seeking judicial review of Commissioner's decision to deny benefits); *Shannon R. v. Comm'r of Soc. Sec.*, Case No. C21-5173, 2021 WL 5371394, at * 6–7 (Nov. 18, 2021) (same)). For this reason, Plaintiff failed to comply with Rule 8.

Beyond this procedural deficiency, Plaintiff's Constitutional claim fails on a substantive basis as well. Plaintiff, relying on *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183 (2020), contends that former-Commissioner Andrew Saul's appointment violated the principle of separation of powers because 42 U.S.C. § 902(a)(3) provides for a six-year term and makes the Commissioner removable only upon a finding of neglect of duty or malfeasance in office. (ECF No. 13 at 12-13.) Accordingly, Plaintiff argues that the Commissioner had no authority to carry out any functions of his office and, by extension, the ALJ had no authority to adjudicate Plaintiff's applications, necessitating a remand. In response, the Commissioner

concedes that § 902(a)(3) violates the principle of separation of powers. (ECF No. 18 at 9 "The

parties agree that 42 U.S.C. § 902(a)(3) violates the separation of powers to the extent it is

construed as limiting the President's authority to remove the Commissioner without cause.")

The parties' agreement on this issue, however, is not dispositive.

Plaintiff asserts that because the removal provision is unconstitutional, any delegations of

power by former Commissioner Saul, including delegations of authority to ALJs or the Appeals

Council who determined her benefits claims, were invalid.  The Commissioner counters,

however, that the ALJ who determined Plaintiff's claim on October 2, 2019, held office on

that date because of a ratification of delegated authority in July 2018, by former Acting

Commissioner Nancy Berryhill, not because of a delegation of authority from former

Commissioner Saul. (ECF No. 18 at 11.)  As the Commissioner correctly notes, an Acting

Commissioner is not subject to § 902(a)(3)'s removal provision thereby making that provision's

constitutionality, or lack thereof, irrelevant. *Butcher*, 2021 WL 6033683, at *6 (citing *Collins v.

Yellin*, 141 S.Ct. 141 S. Ct. 1761, 1781 (2021) (because the FHFA removal restrictions only

applied to the Director, "any constitutional defect in the provisions restricting the removal of a

confirmed Director would not have harmed [the plaintiffs], and they would not be entitled to any

relief" from actions of the Acting Director who enjoyed no such removal protections); *Thomas

E. v. Comm'r of Soc. Sec.*, C21-5107-BAT, 2021 WL 5415241, *5 (W.D. Wash. Nov. 19, 2021)

(finding no constitutional injury where ALJ's appointment was ratified by Acting Director

Berryhill who, as Acting Director, was not subject to the removal provision in § 902(a)(3)); *Alice

T. v. Comm'r of Soc. Sec.*, 8:21CV14, 2021 WL 5302141, *18 (D. Neb. Nov. 15, 2021) (same);

*Boger v. Kijakazi*, No. 1:20-cv-00331-KDB, 2021 WL 5023141, * 3 n.4 (W.D.N.C Oct. 28,

2021) ("Plaintiff's constitutional 'removal restriction' argument is likely not even applicable to

this case because [the ALJ] was appointed by an Acting Commissioner of Social Security who

could be removed from the office at the President's discretion.")).

Plaintiff's insistence in her Reply that "it is uncontested" that the Appeals Council

adjudicated her disability application pursuant to a delegation of authority from former Director

Saul does not support a different result. (ECF No. 19, at 5.)[4]  Even assuming that former

Director Saul appointed the Appeals Council judges who determined Plaintiff's benefits claim,

remand remains unwarranted for several reasons.

First, even accepting, as the Commissioner agrees, that the removal provision in §

902(a)(3) is unconstitutional, it would not have deprived former Commissioner Saul of the ability

to delegate power to others to decide Plaintiff's benefit claim because of the doctrine of

severability. *Butcher,* 2021 WL 6033683, at *7.  As the Supreme Court noted in *Seila Law*,

"'one section of a statute may be repugnant to the Constitution without rendering the whole act

void.'" 140 S.Ct. 2208 (quoting *Loeb v. Columbia Township Trustees*, 179 U.S. 472, 490

(1900)). Indeed, even in the absence of a severability clause, when "'confronting a constitutional

flaw in a statute, [the Supreme Court tries] to limit the solution to the problem, severing any

problematic portions while leaving the remainder intact.'" *Id*. (quoting *Free Enterprise Fund v.*

---

[4] In Reply, Plaintiff explains that she "will not pursue the ALJ issue any further because the ALJ issued his decision while President Trump was still in office."  (ECF No. 19 at 4.)  Consequently, she describes her injuries as arising from the unconstitutional actions of the Appeals Council. Specifically, in Plaintiff's view, she "did not receive the constitutionally valid adjudication process from SSA's Appeals Council" or a "constitutionally valid determination by the Appeals Council."  (*Id*.)  As the above discussion confirms, this distinction is of no consequence.

13

*Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010)). For that reason, in *Seila Law*, the Supreme Court found that the unconstitutional removal provision was severable from the remainder of the CFPB's governing statutes because the CFPB was capable of functioning independently even if the unconstitutional removal provision was stricken. 140 S.Ct. at 2209–10, 2245. The same is true here. If the removal provision in § 902(a)(3) is stricken, the Social Security Administration would remain fully functional. *Butcher,* 2021 WL 6033683, at *7 (citing *Alice A. v. Comm'r of Soc. Sec.*, Case No. C20-5756, 2021 WL 5514434, *6 (W.D. Wash. Nov. 24, 2021) (finding that plaintiff's separation of powers claim failed, in part, because even if § 902(a)(3) was unconstitutional it was severable from the remainder of the statutes governing the Social Security Administration); *Shaun A. v. Comm'r of Soc. Sec.*, Case No. C21-5003-SKV, 2021 WL 5446878, *4 (W.D. Wash. Nov. 22, 2021) (same); *John R. v Comm'r of Soc. Sec.*, 2021 WL 5356719, *8 (same)).

Additionally, even assuming the unconstitutionality of the removal provision in § 902(a)(3), that would not have automatically rendered former Commissioner Saul's appointment invalid. For this reason, it would not have automatically invalidated his actions, including delegating authority to make benefits determinations or ratifying such delegations. *Butcher*, 2021 WL 6033683, at *7. In *Collins v. Yellin*, 141 S.Ct. 141 S. Ct. 1761 (2021), decided after *Seila Law*, the Supreme Court considered a statute similar to § 902(a)(3) governing removal of Directors of the Federal Housing Finance Agency ("FHFA"). The *Collins* majority held that "[a]lthough the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of

14

appointment to that office.  As a result, there is no reason to regard any of the actions taken by the

FHFA [ ] as void." *Id.* at 1787 (emphasis in original); *see also id.* at 1788, n.23 ("Settled

precedent also confirms that the unlawfulness of [a] removal provision does not strip the Director

of the power to undertake the other responsibilities of his office[.]" (citing *Seila Law*, 140 S.Ct. at

2207–2211).  Instead, to obtain reversal of an agency decision, a plaintiff must demonstrate

"compensable harm" flowing from the unconstitutional removal clause. *Collins, 141* S.Ct.. at

1788–89 (remanding for further proceedings to determine whether compensable harm to Plaintiff

occurred due to the President's inability to remove a Director of the Federal Housing Finance

Agency except for cause).

      Here, as the Commissioner contends, Plaintiff has made no showing of compensable

harm.  In fact, as courts considering this precise argument have begun to conclude, it is unlikely

that she could. *See Butcher,* 2021 WL 6033683, at *8; *Crawford,* 2021 WL 5917130, at *8

(reaching identical conclusion on similar facts).  As recognized by Justice Kagan in *Collins*, the

President's choice of SSA Commissioner has very little impact on the result of any particular ALJ

or Appeals Council decision. *Collins,* 141 S.Ct. at 1802 (Kagan, J. concurring) ("[G]iven the

majority's remedial analysis, I doubt the mass of SSA decisions—which would not concern the

President at all—would need to be undone . . . . When an agency decision would not capture a

Nor is the Court persuaded by Plaintiff's argument that harm should be presumed under the

circumstances here. Again, neither appointments nor actions taken by a properly appointed

official are nullified by an unconstitutional removal provision. *Butcher,* 2021 WL 6033683, at *8.

For all these reasons, the Undersigned finds that Plaintiff's separation of powers claim lacks merit.[5] Accordingly, the Undersigned does not reach the Commissioner's alternative arguments including harmless error, *de facto* officer, the rule of necessity, and other prudential considerations.

**B. Opinion of John Biedenbach, CNP**

Plaintiff also argues that the ALJ's evaluation of the opinion offered by John Biedenbach, CNP is not supported by the record. (ECF No. 13 at 8.) The Undersigned disagrees and finds that the ALJ's evaluation of this opinion is supported by substantial evidence.

Plaintiff's application was filed after March 27, 2017, and therefore, it is governed by the revised regulations. *See* 20 C.F.R. §§ 416.913(a), 416.920c (2017). These regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings. 20 C.F.R. § 416.913(a)(1)–(5). Objective medical evidence is defined as "medical signs, laboratory findings, or both." 20 C.F.R. § 416.913(a)(1). "Other medical evidence

---

[5] Significantly, district courts in this Circuit, including, as noted, this one, have rejected the Constitutional claim raised by Plaintiff and consistently have concluded that the allegedly unconstitutional nature of § 902(a)(3) does not require remand. *See Butcher,* 2021 WL 6033683; *Crawford,* 2021 WL 5917130*; Walker v. Comm'r of Soc. Sec.,* No. 4:20-CV-02506-CEH, 2022 WL 1266135, at *1 (N.D. Ohio Apr. 28, 2022); *Miley v. Comm'r of Soc. Sec.,* No. 1:20-CV-2550, 2021 WL 6064754 (N.D. Ohio Dec. 22, 2021); *Wybo v. Kijakazi.*, No. 20-518-HRW, 2021 WL 6052423 (E.D. Ky. Dec. 21, 2021). Courts from other Circuits have held similarly. *See, e.g.*, *Lisa Y. v. Comm'r of Soc. Sec.*, ___ F. Supp. 3d ___, No. C21-5207-BAT, 2021 WL 5177363, at *5 (W.D. Wash. Nov. 8, 2021); *Robinson v. Kijakazi*, No. 1:20-CV-00358-KDB, 2021 WL 4998397, at *3 (W.D.N.C. Oct. 27, 2021); *Alice T. v. Comm'r Soc. Sec.*, No. 8:21CV14, 2021 WL 5302141, at *18 (D. Neb. Nov. 15, 2021); *Standifird v. Comm'r of Soc. Sec.*, No. 20CV1630 GPC (BLM), 2021 WL 5634177, at *3 (S.D. Cal. Dec. 1, 2021). The Undersigned agrees with the reasoning set forth in these other cases and reaches the same result.

is evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of your impairments, your medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." 20 C.F.R. § 416.913(a)(3). "Evidence from nonmedical sources is any information or statement(s) from a nonmedical source (including you) about any issue in your claim." 20 C.F.R. § 416.913(a)(4).

"Medical opinion" and "prior administrative medical finding" are defined as follows:

(2) Medical opinion. A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions . . . .

    (A) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);

    (B) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

    (C) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and

    (D) Your ability to adapt to environmental conditions, such as temperature extremes or fumes . . . .

* * *

(5) Prior administrative medical finding. A prior administrative medical finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record, such as:

    (i) The existence and severity of your impairment(s);

    (ii) The existence and severity of your symptoms;

(iii) Statements about whether your impairment(s) meets or medically equals any listing in the Listing of Impairments in Part 404, Subpart P, Appendix 1; . . . .

(v) . . . your residual functional capacity;

(vi) Whether your impairment(s) meets the duration requirement; and

(vii) How failure to follow prescribed treatment (see § 416.930) and drug addiction and alcoholism (see § 416.935) relate to your claim.

§ 416.913(a)(2), (5).

The governing regulations include a section entitled "[h]ow we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017." 20 C.F.R. § 416.920c (2017). These regulations provide that an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 416.920c(a). Instead, they provide that an ALJ will consider medical source opinions and prior administrative findings using five factors: supportability, consistency, relationship of source to claimant, specialization, and other factors tending to support or contradict a medical opinion or prior administrative medical finding. 20 C.F.R. § 416.920c(c)(1)–(5).

The regulations explicitly indicate that the "most important factors" to consider are supportability and consistency. 20 C.F.R. § 416.920c(b)(2). Indeed, the regulations require an ALJ to "explain how [they] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings" in a benefits determination or decision and allows that the ALJ "may, but [is] not required to, explain how [they] considered"

18

the other factors. 20 C.F.R. § 416.920c(b)(2). If, however, two or more medical opinions or prior

administrative medical findings are equal in supportability and consistency "but are not exactly

the same," an ALJ must also articulate the other most persuasive factors. 20 C.F.R. §

416.920c(b)(3). In addition, when medical sources provide multiple opinions or multiple prior

administrative findings, an ALJ is not required to articulate how he evaluated each opinion or

finding individually but must instead articulate how he considered the opinions or findings from

that source in a single analysis using the five factors described above. 20 C.F.R. § 416.920c(b)(1).

Finally, the regulations explain that the SSA is not required to articulate how it considered

evidence from non-medical sources. 20 C.F.R. § 416.920c(d).

The applicable regulations provide the following guidance for how ALJs should evaluate

the "supportability" and "consistency" of medical source opinions and prior administrative

findings:

> (1) Supportability. The more relevant the objective medical evidence and
> supporting explanations presented by a medical source are to support his or her
> medical opinion(s) or prior administrative medical finding(s), the more persuasive
> the medical opinions or prior administrative medical finding(s) will be.
>
> (2) Consistency. The more consistent a medical opinion(s) or prior administrative
> medical finding(s) is with the evidence from other medical sources and nonmedical
> sources in the claim, the more persuasive the medical opinion(s) or prior
> administrative medical finding(s) will be.

20 C.F.R. § 416.920c(c)(1)-(2). In practice, this means that the "supportability" factor

"concerns an opinion's reference to diagnostic techniques, data collection procedures/analysis,

and other objective medical evidence." *Reusel v. Comm'r of Soc. Sec.*, No. 5:20-CV-1291, 2021

WL 1697919, at *7 n.6 (N.D. Ohio Apr. 29, 2021) (citing SSR 96-2p, 1996 SSR LEXIS 9 (July

2, 1996) (explaining supportability and inconsistency); 20 C.F.R. § 416.927(c)(3), (4)

(differentiating "supportability" and "consistency"); 20 C.F.R. § 416.920c(c)(1), (2) (further

clarifying the difference between "supportability" and "consistency" for purposes of the post-

March 27, 2017 regulations)).

> The ALJ discussed the opinion of John Biedenbach, CNP as follows:

> Mr. Biedenbach completed a medical source statement on January 30, 2019, indicating [Plaintiff] would need to take unscheduled breaks at least hourly during a working day. He noted [Plaintiff]'s symptoms would likely be severe enough to interfere with attention and concentration needed to perform even simple work tasks 25% or more during a typical workday. Mr. Biedenbach stated [Plaintiff] would likely be absent from work as a result of the impairments or treatment more than four days per month (Exhibit 62F). This opinion is not supported by [Plaintiff]'s objective findings in the treatment notes by Mr. Biedenbach or those reflected during clinical testing, thus is not persuasive (Exhibits 67F and 68F). For example, on May 21, 2019, Mr. Biedenbach noted [Plaintiff] had normal inspection of the thoracic/lumbar spine with no spinal tenderness or paraspinal tenderness. Even as recently as July 8, 2019, [Plaintiff] denied having pain during a visit with Mr. Biedenbach (Exhibit 68F). Furthermore, during neurosurgical evaluation on January 15, 2019, Dr. Vasilakis noted [Plaintiff] demonstrated normal gait, as well as normal muscle tone throughout. She had some pain with range of motion of the thoracic/lumbar spine and paraspinal tenderness, but had full range of motion of all extremities (Exhibit 66F).

(R. at 130.)

Plaintiff explains that her pain was the underlying issue and the basis for Mr.

Biedenbach's opinions. According to Plaintiff, the reasons cited by the ALJ in finding

inconsistency – normal gait, muscle tone, and range of motion – are not relevant to her pain and

therefore cannot contradict its existence. Plaintiff cites to particular record evidence that she

believes demonstrates her "ongoing history of significant physical pain" and supports her view

that the ALJ's conclusion to the contrary "represents a fundamental misunderstanding of Mr.

20

Biedenbach's opinions."  (ECF No. 13 at 12; *see also* ECF No. 19 at 3 "The ALJ's reasoning

failed to comprehend the underlying reasoning behind Mr. Biedenbach's opinions.")  The

Commissioner contends that Plaintiff's argument lacks merit and is primarily a disagreement with

the ALJ's weighing of differing medical opinions.

As the above excerpt demonstrates, the ALJ found that Mr. Biedenbach's opinion was

"not supported by the claimant's objective findings in the treatment notes by Mr. Biedenbach or

those reflected during clinical testing." (R. at 130 citing R. at 2372-2426, 2427-2465).  In short,

and as Plaintiff herself acknowledges, the ALJ concluded that Mr. Biedenbach's opinion was

neither consistent with nor supported by objective medical evidence.  (ECF No. 13 at 12 "The

ALJ's allegations that Mr. Biedenbach's opinions are not supported by or consistent with the

record…')  Plaintiff's argument that the ALJ relied only on reports of normal gait, muscle tone,

or range of motion in reaching this conclusion misreads the ALJ's decision.  Moreover, Plaintiff's

suggestion that the ALJ misunderstood that pain was the underlying basis for Mr. Biedenbach's

opinion is merely speculation.

Turning to this latter point first, Mr. Biedenbach's opinion plainly states a diagnosis of

"chronic bilateral thoracic back pain" and symptoms of "chronic back pain; joint pain, right knee

pain."  It also indicates that Plaintiff's need to take unscheduled breaks during a working day

would be caused by her pain symptoms.  (R. at 2298-2299.)  Plaintiff does not offer any evidence

to support her claim of the ALJ's misunderstanding.  As noted, at most, Plaintiff relies on the

ALJ's reference to her normal gait, muscle tone, and range of motion – clinical findings that she

deems irrelevant to the issue of her pain.  In doing so, however, Plaintiff ignores the remainder of

the ALJ's discussion of Mr. Biedenbach's opinion.  As reflected in the excerpt above, the ALJ 's

discussion is not so limited.   Indeed, she also cites Mr. Biedenbach's May 2019 findings of "no

spinal tenderness or paraspinal tenderness;" Plaintiff's denial of pain during a July 2019 visit with

Mr. Biedenbach; and Dr. Vasilakis's report that Plaintiff had "some pain" in January 15, 2019.

(R. at 130.)

Further support for the ALJ's conclusion to discount Mr. Biedenbach's opinions is found

elsewhere in the decision.  The ALJ discussed Mr. Beidenbach's own findings in some detail,

noting that "on September 19, 2018, Mr. Biedenbach indicated the claimant had osteoarthritis . . .

[but] x-rays of the claimant's right knee taken on November 5, 2018, were normal." (R. at 127

citing R.at 2286-2297, 2372.)  She also observed that "[o]n that same day, Mr. Biedenbach noted

during examination that the claimant had only slight edema of the right knee, which was not

tender." (*Id.* citing R.at 2427-2432.)  Additionally, the ALJ recounted that on July 26, 2018, "Mr.

Biedenbach noted the claimant's thoracic back pain was well controlled" and that a CT scan of

the claimant's thoracic spine taken in August 2018, showed stable postsurgical changes of the

dorsal spine. (R. at 128 citing R.at 2290; 2275.)  Further, the ALJ noted that on May 21, 2019,

"Mr. Biedenbach noted that [Plaintiff] had normal inspection of the thoracic/lumbar spine with no

spinal tenderness or paraspinal tenderness."  (*Id*. citing R. at 2453.)

Beyond this, the ALJ discussed objective medical evidence from other providers which

contradicts the limitations opined by Mr. Biedenbach.  For example, the ALJ noted that

orthopedic records from Dr. Kumler dated February 28, 2018, revealed no "significant pain over

the lumbar spine" and no "significant objective findings" overall.  (R. at 127 citing R. at 1925.)

The ALJ also cited a clinic note from Dr. Ghodsi dated May 25, 2018, stating that "[Plaintiff] has no significant disc herniation or central stenosis" and that he "[did] not think she requires any intervention as far as the lumbar spine is concerned." (R. at 128 citing R. at 2239.) Similarly, the ALJ noted that when Plaintiff saw Dr. Ghodsi on August 21, 2018, Plaintiff ambulated without assistance, had 5/5 motor strength of the bilateral lower extremities, and denied any chest pain, muscular weakness, tingling, or numbness. (*Id.* citing R. at 2280-2283.) The ALJ also noted that X-rays on June 5, 2019, showed only mild abnormalities, including mild curvature of the lumbar spine, mild multilevel degenerative disc disease, mild facet degenerative changes of the lower lumbar spine, and postsurgical changes of previous thoracic spine surgery. (*Id.* citing R. at 2420.) The ALJ was not required to repeat this analysis in the evaluation of Mr. Biedenbach's opinion. *Carlene C. v. Comm'r of Soc. Sec. Admin.*, No. 3:20-CV-245, 2022 WL 278168, at *5 (S.D. Ohio Jan. 31, 2022) (citing *Sprague v. Colvin*, 2015 WL 2066227, at *3 (S.D. Ohio May 4, 2015)).

To be sure, Plaintiff points to abnormal findings in the record that she believes support Mr. Biedenbach's assessments. However, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks omitted). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). And "it is not necessary that this court agree with the Commissioner's findings," so long as it meets this low standard for evidentiary support.

23

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) ("The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.")).  While Plaintiff may disagree with the ALJ, the ALJ's findings in this case were well within the zone of reasonable choices. *See McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 833 (6th Cir. 2006).  Accordingly, the Undersigned finds no merit to Plaintiff's remaining contention of error.

## VII.   CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Based on the foregoing, it is therefore, **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED.**

## VIII.   PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a forfeiture of the right to *de novo* review by the District Judge and forfeiture of the right to appeal the judgment of the District Court.  Even when timely objections are filed, appellate review of issues not raised in those objections is forfeited.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:  May 17, 2022                              *s/ Elizabeth A. Preston Deavers*
                                                 Elizabeth A. Preston Deavers
                                                 United States Magistrate Judge

25